No. 19-5516

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| EMW WOMEN'S SURGICAL CENTER, ET AL., | : : : | On Appeal from the United States District Court for the Western District of Kentucky |
| Plaintiffs-Appellees, | : | |
| v. | : | |
| ADAM MEIER, ET AL., | : : | District Court Case No. |
| Defendants-Appellants. | : : | 3:18-cv-00224 |

---

## BRIEF OF *AMICI CURIAE* STATES OF OHIO, ALABAMA, ARKANSAS, GEORGIA, IDAHO, INDIANA, KANSAS, LOUISIANA, MISSISSIPPI, MISSOURI, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, TENNESSEE, TEXAS, AND WEST VIRGINIA IN SUPPORT OF DEFENDANTS-APPELLANTS

---

DAVE YOST
Ohio Attorney General

BENJAMIN M. FLOWERS*
State Solicitor
  *Counsel of Record
STEPHEN P. CARNEY
Deputy Solicitor
TIFFANY L. CARWILE
Assistant Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for Amicus State of Ohio
(Additional counsel on signature block)*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................ii

INTRODUCTION AND STATEMENT OF *AMICI* INTEREST ......................1

ARGUMENT.........................................................................................7

    I.    *Gonzales*, not *Hellerstedt*, provides the appropriate framework for assessing the constitutionality of Kentucky's death-before-dismemberment statute....................................................................7

    II.   States may regulate abortion methods and need not give abortion clinics and doctors unfettered choice to use whichever method they like. ...........................................................................19

    III.  Although no injunction is warranted, any possible injunction against Kentucky's death-before-dismemberment law must be limited in scope.................................................................22

CONCLUSION...................................................................................23

CERTIFICATE OF COMPLIANCE ..................................................25

CERTIFICATE OF SERVICE ............................................................26

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Agostini v. Felton*,
    521 U.S. 203 (1997) ............................................................................ 13

*Ayotte v. Planned Parenthood*,
    546 U.S. 320 (2006) ................................................................ 6, 22, 23

*Bendix Autolite Corp. v. Midwesco Enters., Inc.*,
    486 U.S. 888 (1988) .......................................................................... 10

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) .................................................................*passim*

*Hopkins v. Jegley*,
    267 F. Supp. 3d 1024 (E.D. Ark. 2017) ........................................... 17

*Mayhew v. Town of Smyrna*,
    856 F.3d 456 (6th Cir. 2017) ............................................................ 13

*Nat'l Abortion Fed'n v. Ashcroft*,
    330 F. Supp. 2d 436 (S.D.N.Y. 2004) ............................................. 17

*Planned Parenthood Fed'n of Am. v. Ashcroft*,
    320 F. Supp. 2d 957 (N.D. Cal. 2004) ............................................. 17

*Planned Parenthood of Greater Ohio v. Hodges*,
    917 F.3d 908 (6th Cir. 2019) ............................................................ 19

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of the Ind. State Dep't
of Health*,
    917 F.3d 532 (7th Cir. 2018) .............................................................. 1

*Planned Parenthood SW Ohio Region v. DeWine*,
    696 F.3d 490 (6th Cir. 2012) ............................................................ 20

*Planned Parenthood SW Ohio Region v. Yost*,
    375 F. Supp. 3d 848 (S.D. Ohio 2019) .......................................*passim*

*Richmond Med. Ctr. for Women v. Gilmore*,
    55 F. Supp.2d 441 (E.D. Va. 1999) ...................................................... 18

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) ............................................................................... 2

*Tulsa Women's Reproductive Clinic v. Hunter*,
    Case No. CV-2015-1838 (Okla. Dist. Ct.) .......................................... 4

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) .................................................................*passim*

*Whole Woman's Health v. Paxton*,
    5th Cir. No. 17-51060 ......................................................................... 17

*Women's Med. Prof'l Corp. v. Taft*,
    162 F. Supp. 2d 929 (S.D. Ohio 2001) ............................................. 17

*Women's Med. Prof'l Corp. v. Taft*,
    353 F.3d 436 (6th Cir. 2003) ............................................... 8, 15, 21

## Statutes

18 U.S.C. §1531 ................................................................................................ 9

## INTRODUCTION AND STATEMENT OF *AMICI* INTEREST

Every State in the Union has animal-welfare laws.  "Dogs may not be beaten for fun.  Bullfights are forbidden.  Horses may not be slaughtered."  And so on.  *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of the Ind. State Dep't of Health*, 917 F.3d 532, 537 (7th Cir. 2018) (Easterbrook, J., dissenting from denial of rehearing en banc).  "Animal-welfare statutes are rational not simply because all mammals can feel pain and may well have emotions, but also because animal welfare affects human welfare":  "Many people feel disgust, humiliation, or shame when animals … are poorly treated."  *Id*.  So States do what they can to set some minimum baseline of ethical treatment.

This case presents the question whether States can extend the same benefit to unborn children.  More precisely, can States require (at least in some circumstances) that doctors cause an unborn child's death before dismembering him or her during a dilation-and-evacuation abortion?  The Supreme Court has described these "D&E" abortions as "laden with the power to devalue human life."  *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007).  Understandably so.  Here is how they work:  "The doctor, often guided by ultrasound, inserts grasping forceps through the woman's cervix and into the uterus to grab the fetus."  *Id*. at 135.  The doctor then begins to pull, and keeps pulling "even after meeting resistance from the cervix.

The friction causes the fetus to tear apart. For example, a leg might be ripped off." *Id.* The doctor then continues this process until every part of the unborn child "has been completely removed." *Id.* at 135–36. At some point in the process, the unborn child "bleeds to death as it is torn limb from limb." *Stenberg v. Carhart*, 530 U.S. 914, 958-59 (2000) (Kennedy, J., dissenting). Yet the unborn child can "survive for a time while its limbs are being torn off." *Id.* at 959. Indeed, a provider testified in *Stenberg* that ultrasound revealed a heartbeat continuing even after "'extensive parts of the fetus [were] removed.'" *Id.* In the end, the "abortionist is left with 'a tray full of pieces.'" *Id.* Doctors them reassemble the body in a dish to make sure they removed every part.

Justices on both sides of the *Stenberg* and *Gonzales* decisions agreed that the dismemberment method at issue here is similar to the partial-birth method (namely, "intact D&E") at issue in those cases. In her *Gonzales* dissent, for example, Justice Ginsburg explained that dismemberment "could equally be characterized as brutal, involving as it does tearing a fetus apart and ripping off its limbs," calling it "equally gruesome" as, and no less "akin to infanticide" than, partial-birth abortion. *Gonzales*, 550 U.S. at 182 (Ginsburg, J., dissenting) (internal alterations and quotation marks omitted).

In order to bring a small dose of humanity to this procedure, Kentucky and many other States, including Ohio, have enacted laws that require a slight modification to the D&E procedure. These laws require that a doctor, instead of dismembering a *living* unborn child, dismember the child only after first causing fetal demise by some other method, such as an injection or severing the umbilical cord ("cord transection"). The States have at least two valid interests in advancing a death-before-dismemberment requirement: (1) promoting respect for life, including unborn life, and (2) protecting the medical community. *See Gonzales*, 550 U.S. at 157.

Of course, under binding Supreme Court precedent, States may not regulate abortion so as to impose an "undue burden" on those seeking to obtain a pre-viability abortion. But death-before-dismemberment laws impose no such burden—at the very least, they do not impose such a burden in *all* cases, making facial invalidation of these laws improper. Indeed, many clinics throughout the country, including clinics within the *amici* States, already pursue death before dismemberment. Ohio, for example, is in the midst of defending its own death-before-dismemberment statute, and *the plaintiffs' own evidence* in that case confirms that abortion doctors can, and often do, cause death before dismemberment, in part because many mothers prefer it. Indeed, the Planned Parenthood Federation of

America for years *mandated* that all affiliates use digoxin to kill unborn children before dismembering them, starting at 18 weeks gestation. Based on that evidence, the district court in Ohio's case refused to enjoin Ohio's death-before-dismemberment law in many of its applications. *Planned Parenthood SW Ohio Region v. Yost*, 375 F. Supp. 3d 848, 871-72 (S.D. Ohio 2019). An Oklahoma trial court just recently rejected a challenge to a similar law in that State. *Tulsa Women's Reproductive Clinic v. Hunter*, Case No. CV-2015-1838 (Okla. Dist. Ct.), Entry of July 12, 2019 (docket available at www.oscn.net/dockets/GetCaseInformation.aspx ?db=oklahoma&cmid=3319182).

In sum, death-before-dismemberment laws do not cause an undue burden—at the very least, they do not cause an undue burden *in all applications*, which should defeat any claim to facially invalidating these laws.

The District Court, however, invalidated Kentucky's death-before-dismemberment law in its entirety. *See* Memorandum Opinion, R.126 ("Dist. Op.") at 27, PageID#5750. Its decision misapplied the law in three ways relevant to this amicus brief.

*First*, the District Court erred by applying the balancing test from *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). That case says that, when a State purports to justify a law on the ground that it protects maternal welfare, the

State must show that the law's health benefits are significant enough to justify the burdens it imposes on obtaining an abortion. This test has no bearing on death-before-dismemberment laws, since those laws are designed not to regulate the health and safety of the procedure, but rather to protect the medical community and promote respect for life. In the context of laws like these, *Gonzales*, not *Hellerstedt*, sets forth the relevant test: the law is constitutional as long as it has neither the "purpose [n]or effect" of placing "a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Gonzales*, 550 U.S. at 146. The test asks simply whether the obstacle is "substantial" in objective terms—it does not require courts to somehow quantify the State's interests in protecting life or protecting medical ethics and then to somehow weigh those immeasurable interests against the burdens the law imposes.

*Second*, the District Court erred in finding an undue burden based on the plaintiffs' assertions that they would stop performing second-trimester abortions if the death-before-dismemberment law went into effect. Feasibility of a regulation turns on whether a procedure *can be* carried out safely and effectively, not whether one clinic is *willing* or *able* to perform that procedure. *See id*. at 166. As the Supreme Court expressly recognized in *Gonzales*, States may prohibit certain methods of carrying out an abortion *without regard* to whether doctors *prefer* to use

that method. *Id.* at 166. To hold otherwise would permit abortion providers to veto state law simply by insisting that they are "disinclined to follow the proscription" on a particular method. *Id.* As long as the law leaves open legal avenues by which doctors can provide safe, effective, pre-viability abortions, it is not unconstitutional—regardless of whether there are any doctors willing to pursue those avenues.

*Finally*, the lower court erred by disregarding the rule that courts must "enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006). The District Court enjoined Kentucky's law in its entirety, without considering whether the law is unconstitutional in all of its applications. But the law is certainly *not* unconstitutional in all of its applications—a great deal of evidence establishes that doctors can and do cause fetal demise before performing D&E abortions. In Planned Parenthood's challenge to Ohio's death-before-dismemberment law, for example, the evidence established that doctors can cause fetal demise when the mother is 18 weeks pregnant. As a result, the Southern District of Ohio held that "a limited injunction [was] indeed available," and enjoined the law only in its applications before 18 weeks gestation and in other limited circumstances. *Yost*, 375

F. Supp. 3d at 871.  The District Court in this case should have taken a similarly focused approach.

Because affirming the District Court's rationale could hamper other States' efforts at regulating D&E abortions, the *amici* States are filing this brief under Rule 29(a)(2) of the Federal Rules of Appellate Procedure, and asking the Court to reverse.

## ARGUMENT

This brief focuses on three of the District Court's errors:  its use of *Hellerstedt*'s balancing test in place of *Gonzales*'s substantial-obstacle test; its deference to the methodological preference of abortion providers; and its entry of an injunction broadly enjoining the death-before-dismemberment law in all its applications.

**I.**   ***Gonzales*, not *Hellerstedt*, provides the appropriate framework for assessing the constitutionality of Kentucky's death-before-dismemberment statute.**

Kentucky's death-before-dismemberment statute regulates a method of performing abortions:  it requires anyone who performs a D&E abortion to kill the unborn child before dismembering him or her.  The law is not directed to protecting the mother's health and safety.  Instead, it is aimed at promoting respect for life and protecting the medical community.  Under *Gonzales v. Carhart*, 550 U.S. 124 (2007), regulations like these—that is, regulations that limit a procedure in order to

promote respect for life and safeguard medical ethics—are constitutional as long as they leave open safe and effective alternative methods of abortion. *Id*. at 164. Courts need not go further and perform the impossible task of weighing the burden the law imposes against the incommensurable interests in promoting life and protecting the medical community. While courts must balance benefits versus burdens to assess the constitutionality of *health-and-safety* regulations, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), they need not perform that balancing outside the health-and-safety context. The District Court held otherwise, and that error permeated its analysis.

**A.** "[A] state may regulate abortion before viability as long as it does not impose an 'undue burden' on a woman's right to terminate her pregnancy." *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 443 (6th Cir. 2003) (quoting *Planned Parenthood v. Casey*, 505 U.S. 833, 876 (1992)). A regulation creates an undue burden if its "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Gonzales*, 550 U.S. at 146 (quotation omitted). This case presents the question of how the undue-burden test applies to laws that regulate the method of performing a procedure to promote State interests other than maternal health and safety.

*Gonzales* is the last Supreme Court case that considered such a law. The case involved the constitutionality of the federal Partial Birth Abortion Act of 2003, 18 U.S.C. §1531, *et seq.*, which banned "intact D&E abortions," also called "dilation and extraction" or "D&X" abortions. In that particular variation of the D&E procedure, the unborn child is partially delivered, the child's skull is crushed or vacuumed out, and it is then removed intact. *Gonzales*, 550 U.S. at 139-40.

The Supreme Court upheld the ban on this procedure. It first determined that the law's *purpose* was not to impose a substantial obstacle in the way of obtaining a pre-viability abortion. Instead, the law furthered the State's legitimate interests in expressing "respect for the dignity of human life" and "protecting the integrity and ethics of the medical profession." *Id*. at 157 (internal quotation marks omitted). The Court explained that the "government may use its voice and its regulatory authority to show its profound respect for the life within the woman." *Id*. The ban on partial-birth abortion furthered that interest by banning a "procedure itself laden with the power to devalue human life"—one that involved killing the unborn child "just inches before completion of the birth process," and that therefore had a "disturbing similarity to the killing of a newborn infant." *Id*. at 158 (internal quotation marks omitted). The same ban promoted the government's interest in protecting the medical profession by drawing bright lines to keep doctors

9

from becoming involved in procedures that end life instead of preserving it. *Id.* at 157.

This left only the question whether the law's effects imposed a substantial obstacle on the right to a pre-viability abortion. In conducting this undue-burden analysis, the Court did not balance the benefits of these interests against their burdens. Indeed, it would have been impossible to do so. How would one weigh the law's effect on the promotion of respect for life versus the burden the law imposes on the right to obtain a pre-viability abortion? That is rather like asking "whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring).

Instead, the Court simply asked whether the law, objectively speaking, made it substantially more difficult to obtain a pre-viability abortion. The challengers argued that it did, because the ban on intact D&E abortions "create[d] significant health risks for women." *Gonzales*, 550 U.S. at 161. But the Court was unpersuaded. First, it recognized scientific uncertainty regarding whether intact D&E had any medical advantages over other (non-banned) forms of D&E abortion, *id.* at 161–162, and held that "legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty," *id.* at 163. Second, the Court pointed out that "[a]lternatives are available to the prohibited procedure." *Id.* at

10

164. One alternative to the intact D&E was a "regular" D&E—in other words, the dismemberment procedure at issue here.  Alternatively, providers might perform even an *intact D&E* abortion, without violating federal law, as long as they cause fetal demise using an "injection that kills the fetus."  *Id.*

Given the lack of evidence that these alternatives were less safe or reliable than intact D&E, banning intact D&E imposed no substantial obstacle on the right to an abortion.  *Id.* at 165.  In sum, because the Act left in place reliable, safe, and effective alternatives to the proscribed method, it imposed no undue burden.  *Id.* at 164–65.

*Gonzales* thus stands for the following proposition:  the government can limit an abortion method to promote a respect for life or protect the medical community, as long as it leaves doctors free to use feasible and safe alternative methods.  Those alternatives may include entirely different methods of abortion or, as in *Gonzales* and this case, the alternative of causing fetal demise before performing an otherwise-identical procedure.

**B.**  Years later, the Supreme Court adopted a somewhat different approach for assessing the constitutionality of health-and-safety regulations in the abortion context.  Specifically, when the State advances a health-and-safety justification for an abortion regulation, courts must "consider the burdens a law imposes on

abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2309. In other words, courts must determine whether the regulation will confer health-and-safety benefits that are weighty enough to justify whatever burden they impose on those who wish to obtain a pre-viability abortion. *Id.*; *see, e.g.*, *id.* at 2310–13.

*Hellerstedt*'s balancing approach is certainly subject to criticism, even in the health-and-safety context. *See, e.g.*, at 2324 (Thomas, J., dissenting). But at least in that context, one can speak coherently about balancing benefits versus burdens. After all, health benefits are in some sense measurable, so it is conceivable that one could balance a health-and-safety regulation's health benefits against its burdens. Such balancing is impossible, however when it comes to *immeasurable* government interests, such as the government's interest in promoting respect for life and medical ethics. How would a court go about: (1) measuring a State's interest in stopping the "coarsen[ing of] society to the humanity of not only newborns, but all vulnerable and innocent human life," *Gonzales*, 550 U.S. at 157 (internal quotation marks omitted); and then (2) weighing that interest against the burdens the regulation imposes in order to determine whether the "benefits [are] sufficient to justify the burdens upon access," *Hellerstedt*, 136 S.Ct. at 2300? Even attempting

such weighing would require making a *policy* judgment about the *value* of respecting life.  Our Constitution leaves that sort of policy decision to legislators, not judges.

To be sure, if *Hellerstedt* required applying a balancing test in *all* cases arising under the undue-burden test, this Court would have to follow that precedent no matter how little sense it made.  But *Hellerstedt* requires no such thing.  As an initial matter, *Hellerstedt* involved only health-and-safety regulations, and never addressed the question of how the undue-burden test might apply outside that context.  In addition, the *Hellerstedt* test's incompatibility with immeasurable government interests suggests that the Court did not intend for it to apply outside the health-and-safety context.  Indeed, it would be shocking if it meant to overrule *Gonzales* by requiring a balancing in every case:  it never purports to overrule anything, and the same Justice who wrote *Gonzales* ( Justice Kennedy) joined the *Hellerstedt* majority.

Even if *Hellerstedt* had undermined *Gonzales*'s logic, this Court would have to go on applying *Gonzales*.  When "a precedent of " the Supreme Court "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."  *Agostini v. Felton*, 521 U.S. 203, 237 (1997); *accord Mayhew v. Town of Smyrna,* 856 F.3d 456, 464 (6th Cir. 2017).  Thus, in cases implicating the government's interest in

promoting respect for life and protecting the medical profession, *Gonzales* controls unless and until the Supreme Court says otherwise.

**C.** Notwithstanding the irrelevance of *Hellerstedt*, the District Court struck down Kentucky's death-before-dismemberment statute because it concluded that the law results in burdens that its benefits cannot justify. *See* Dist. Op., R.126, PageID#5742–45. Because the court applied the wrong standard, this Court should reverse or vacate and remand for further proceedings.

On remand, it is quite likely that Kentucky's law will survive scrutiny under *Gonzales*. At the very least, it will be held constitutional in some of its applications. Again, the question under *Gonzales* is whether a law's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." 550 U.S. at 146 (quotation omitted). With respect to purpose, death-before-dismemberment laws further the very same interests as the partial-birth abortion ban in *Gonzales*: (1) promoting "respect for the dignity of human life" and (2) "protecting the integrity and ethics of the medical profession." *Id.* at 157 (internal quotation marks omitted). "No one would dispute that, for many, D&E is a procedure itself laden with the power to devalue human life." *Id.* at 158. That is especially true when the performing doctor does not even try to cause fetal demise. An abortion in that context entails dismembering a still-living being. Sure-

14

ly a State could conclude that "[i]mplicitly approving such a brutal and inhumane procedure by choosing not to prohibit it will further coarsen society to the humanity of not only newborns, but all vulnerable and innocent human life, making it increasingly difficult to protect such life." *Id*. at 157 (internal quotation marks omitted). The government has strong interests both in stopping that devaluation of life and in protecting the medical profession from becoming involved in it. *Id*.

That leaves only the question whether death-before-dismemberment laws have the *effect* of placing a substantial burden in the way of women looking to get an abortion. They do not, at least in many cases, because a D&E performed *after* fetal demise is a safe and reliable alternative to performing D&E abortions on still-living unborn children.

As an initial matter, the risks associated with D&E performed *after* fetal demise are marginal. Indeed, they are the same risks associated with the D&E procedure itself—vomiting, infection, extramural delivery, hospitalization, perforations. Dist. Op., R.126, PageID#5736, 5739, 5741. This Court has held that "marginal or insignificant risks generalized to the entire population of women seeking late second-trimester abortions" do not rise to the level of an undue burden. *Women's Med. Prof'l Corp.*, 353 F.3d at 447.

Additionally, doctors can cause fetal demise before performing a D&E abortion at every stage of pregnancy in which D&E abortions are performed. They have at least two options for doing so. The first involves injecting digoxin, a drug that kills the fetus. While providers generally use digoxin injections starting at 17 or 18 weeks gestation, there is good evidence that they can use injections earlier. *See* Kentucky Br. 43–45. To the extent the science on that question is unsettled, *Gonzales* entitles Kentucky's legislature to the benefit of the doubt: "The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." 550 U.S. at 163.

Regardless of precisely when digoxin injection becomes an option, history and practice leave no doubt that it *does* become an option at some point before viability. Over a decade ago, the Supreme Court noted that some abortion doctors used injections of digoxin or potassium chloride to cause fetal demise. *Id.* at 136. Indeed, the Court explained that the federal ban on partial-birth abortion "only applie[d] to the delivery of a living fetus." *Id.* at 164 (quotation omitted). The Court then noted that the fetal-demise methods already used by some providers were available alternatives to the banned form of intact D&E abortions. *Id.* And shortly after *Gonzales*, Planned Parenthood Federation of America *mandated* that all affiliates use digoxin to cause fetal demise before most abortions starting at 18

weeks gestation. It kept this nationwide mandate in place for years. *Whole Woman's Health v. Paxton*, 5th Cir. No. 17-51060, Texas Br. at 30–31.

Furthermore, clinics in several States with laws much like Kentucky's already perform fetal demise. For example, clinics in Arkansas and Texas used digoxin to cause fetal demise for some of their D&E procedures. *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1038-39 (E.D. Ark. 2017); *Paxton*, Texas Br. at 30-32. At least two clinics in Ohio use digoxin to cause fetal demise. *Yost*, 375 F. Supp. 3d at 857.

That digoxin is used throughout the country and was once mandated by Planned Parenthood Federation of America shows that it is safe, effective, and feasible. The use of fetal demise by abortion providers across the country is of particular significance because, before *Gonzales* upheld the ban on partial-birth abortionsome of those same abortion providers objected to fetal demise as an unnecessary procedure that has risks but little benefit—the same arguments they are making now. *See Planned Parenthood Fed'n of Am. v. Ashcroft*, 320 F. Supp. 2d 957, 995 (N.D. Cal. 2004); *Nat'l Abortion Fed'n v. Ashcroft*, 330 F. Supp. 2d 436, 481 (S.D.N.Y. 2004); *Women's Med. Prof'l Corp. v. Taft*, 162 F. Supp. 2d 929, 958 (S.D. Ohio 2001), *rev'd*, 353 F.3d 436 (6th Cir. 2003). Since then, it has become a routine part of at least some D&E procedures in many of these clinics. If abortion providers could use fetal demise as a safe and reliable alternative to partial-birth

abortion on a living fetus, they can use fetal demise as a safe and reliable alternative to a live-dismemberment abortion.

Doctors can cause fetal demise in a second way unrelated to digoxin injections: they can perform an "umbilical cord transection," in which doctors cause fetal death by cutting the umbilical cord. Doctors can perform cord transactions at any point of pregnancy where D&E abortion is an option. This follows from the fact that cord transection is, in all important aspects, nearly identical to the D&E procedure itself. Both require a doctor to dilate the cervix and then use an instrument to rupture the membranes. *Yost*, 375 F. Supp. 3d at 855. Both require an instrument to be inserted into the uterus in order to grasp part of the cord or fetal tissue. *Id.* at 855, 861. And both involve a doctor pulling the grasped cord or tissue through the cervix, and then causing demise either by cutting the cord or by dismembering the unborn child. *Id.*; *Richmond Med. Ctr. for Women v. Gilmore*, 55 F. Supp.2d 441, 454-55 (E.D. Va. 1999), *aff'd*, 224 F.3d 337 (4th Cir. 2000). Since doctors can perform D&E abortions at 15 or 16 weeks gestation, there is no reason they cannot safely and reliably perform a cord transection at the same stage of pregnancy.

\*       \*       \*

Live-dismemberment abortions devalue human life and harm the integrity of the medical profession to the same extent as partial-birth abortion. Accordingly, Kentucky passed a regulation that permits the continued use of the D&E method but requires a simple modification to make it less brutal and more humane—fetal demise. The District Court applied the wrong test in holding that Kentucky's law constitutes an undue burden. The Court should vacate its ruling so that the District Court can apply the proper test, under which Kentucky's death-before-dismemberment law—indeed, *any* death-before-dismemberment law—is likely to survive constitutional scrutiny, at least in some applications.

## II.   States may regulate abortion methods and need not give abortion clinics and doctors unfettered choice to use whichever method they like.

The District Court misapplied the relevant law in a second important way: it wrongly assumed that, in challenges to a limit on particular procedures, plaintiffs can establish an undue burden by showing that existing clinics are either unwilling or unable to adopt alternative, feasible procedures.

**A.** Abortion doctors and clinics have no constitutional right to perform abortions at all. *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 910 (6th Cir. 2019) (en banc). And if they perform abortions, they do not have "unfettered

choice" to use whichever methods they please. *Gonzales*, 550 U.S. at 163. Nor do patients have unfettered choice to use whichever method they please: the right "to choose abortion" does not "encompass[] the right to choose a particular abortion method." *Planned Parenthood SW Ohio Region v. DeWine*, 696 F.3d 490, 514-15 (6th Cir. 2012) (McKeague, J., concurring).

All of this makes sense. "[A]llowing a doctor to choose the abortion method he or she might prefer" would "set at naught" the State's interest "in protecting the life of the fetus that may become a child." *Gonzales*, 550 U.S. at 158. Thus, "[p]hysicians are not entitled to ignore regulations that direct them to use reasonable alternative procedures." *Id*. at 163. Instead, abortion doctors, just like any other doctors, must follow state laws regulating medical procedures. True, a State law amounts to an undue burden on patients if it limits doctors to using infeasible or unsafe abortion methods. But if the State's limit on a particular method leaves doctors legally free to perform alternatives that are both feasible and safe, then physicians cannot veto the state law by refusing to take up those alternatives. For example, *Gonzales* upheld the federal ban on intact D&E abortions even though many doctors preferred that method, in part because the law did not prohibit several other methods of abortion. *Id*. at 164.

**B.** The District Court ignored all this. Its decision repeatedly notes that the plaintiff doctors threatened to stop providing D&E abortions if Kentucky's law took effect. And because of this threat, the court concluded that Kentucky's law imposed an undue burden on women seeking abortions in the stages of pregnancy where D&E abortions are the only option. Dist. Op., R.126, PageID#5734, 5745-47.

The logic does not hold up: if doctors can feasibly and safely perform D&E abortions after fetal demise, *see above* at 14–18, then it does not matter whether the doctors now performing abortions in Kentucky are able or willing to do the same. Kentucky has an interest in protecting life, and it "may use its regulatory power to bar certain procedures and substitute others." *Gonzales*, 550 U.S. at 158. Doctors cannot claim a veto power over state law by refusing to accept the substitution. To hold otherwise would contravene Supreme Court and Sixth Circuit precedents recognizing that States need not "grant physicians unfettered discretion in their selection of abortion methods." *Women's Med. Prof'l Corp.*, 353 F.3d at 447 (internal quotation marks omitted); *accord Gonzales*, 550 U.S. at 163. And it would give doctors the power to *create* undue burdens that do not truly exist.

\*      \*      \*

"Physicians are not entitled to ignore regulations that direct them to use reasonable alternative procedures." *Gonzales*, 550 U.S. at 163. Because the District

Court mistakenly deemed relevant the plaintiffs' threatened refusal to cause fetal demise before dismemberment, it applied the wrong test.

### III. Although no injunction is warranted, any possible injunction against Kentucky's death-before-dismemberment law must be limited in scope.

The District Court's third error is that it failed to consider whether Kentucky's death-before-dismemberment law is constitutional in *some* applications.

When courts determine that a state law violates the Constitution, they must "enjoin only the unconstitutional applications of [that] statute while leaving other applications in force." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006). "Accordingly, the normal rule is that partial, rather than facial, invalidation is the required course, such that a statute may be declared invalid to the extent that it reaches too far, but otherwise left intact." *Id.* (quotations and alternation omitted). Courts should, in other words, "limit the solution to the problem." *Id.* at 328.

In the context of this case, limiting the solution to the problem means refusing to enjoin the death-before-dismemberment law in many of its applications. Even if *some* applications of Kentucky's law were likely to cause an undue burden— even if, for example, the only reasonable option for abortion during a certain phase of pregnancy consisted of live dismemberment—other applications are certain *not* to be unconstitutional. Again, many clinics throughout the nation admit that they

use digoxin starting at 18 weeks, and the record evidence shows that digoxin is a safe, available, and common alternative at this stage of the woman's pregnancy. *See above* at 14–17. And while the Kentucky doctors do not use digoxin, their reluctance to use a common and safe alternative does not mean that the statute creates an undue burden. *Gonzales,* 550 U.S. at 163; *see above* 19–22.

Based on similar facts, the Southern District of Ohio entered a partial injunction of Ohio's death-before-dismemberment law. There, the plaintiffs' own evidence established that doctors can and do safely perform D&E abortions beginning at 18 weeks (at the latest). *Yost*, 375 F. Supp. 3d at 857. Based on this, the District Court applied *Ayotte* and determined that "a limited remedy is indeed available." *Id*. at 871. With a few as-applied exceptions, the court held that Ohio's death-before-dismemberment law could take effect across Ohio—including in the plaintiff clinics that did not use fetal demise in their practices—for dismemberment abortions occurring at or later than 18 weeks gestation. *Id.* at 857, 872.

In contrast, it does not appear the District Court in this case considered the availability of narrowly drawn relief. The Court should order it to do so on remand.

## CONCLUSION

The Court should reverse the decision below.

Respectfully submitted,

STEVE MARSHALL
  Attorney General of Alabama

LESLIE RUTLEDGE
  Attorney General of Arkansas

CHRIS CARR
  Attorney General of Georgia

LAWRENCE WASDEN
  Attorney General of Idaho

CURTIS T. HILL, JR.
  Attorney General of Indiana

DEREK SCHMIDT
  Attorney General of Kansas

JEFF LANDRY
  Attorney General of Louisiana

JIM HOOD
  Attorney General of Mississippi

ERIC SCHMITT
  Attorney General of Missouri

DOUG PETERSON
  Attorney General of Nebraska

MIKE HUNTER
  Attorney General of Oklahoma

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS*
State Solicitor
  *Counsel of Record*
STEPHEN P. CARNEY
Deputy Solicitor
TIFFANY L. CARWILE
Assistant Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioattorneygeneral.gov

ALAN WILSON
  Attorney General of South Carolina

HERBERT H. SLATERY III
  Attorney General and Reporter of Tennessee

KEN PAXTON
  Attorney General of Texas

PATRICK MORRISEY
  Attorney General of West Virginia

*Attorneys for Amici States*

24

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this amicus brief complies with the type-volume for an amicus brief and contains 5,157 words.    See Fed. R. App. P. 29(a)(5); 32(a)(7)(B)(i).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS

## CERTIFICATE OF SERVICE

I hereby certify that this brief was filed electronically on July 17, 2019. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS